## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF TEXAS
### MARSHAL DIVISION

| | |
|---|---|
| **C. S. SLADE, Sr.,Individually, DOROTHY SLADE, Individually, KIM SPEARMAN, as next friend of  M.  S., a Minor COREN SLADE-BELL, as nextfriend of C. K. , J., a Minor, COREN SLADE-BELL, Individually, TANISHA SLADE, Individually and HEIRS OF MARCUS DEWAYNE SLADE** | **CAUSE NO:_____** |
| **PLAINTIFFS** | **COMPLAINT FOR  DAMAGES FOR VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C.A. §1983 AND PENDENT STATE LAW CLAIMS** |
| **Vs.** | |
| **CITY OF MARSHALL, TEXAS FORMER POLICE  CHIEF STANLEY SPENCE; JOHN JOHNSTON; CORTNEY WELLS,  STACEY ROACH and TASER INTERNATIONAL, INC.** | **DEMAND FOR JURY TRIAL** |
| **DEFENDANTS** | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW PLAINTIFFS, C.S. SLADE, Sr., Individually Father  of MARCUS

DEWAYNE SLADE, Deceased; DOROTHY SLADE, Individually Mother of MARCUS

DEWAYNE SLADE, Deceased; KIM SPEARMAN, as next friend of M. S. , a Minor, Son of

MARCUS DEWAYNE SLADE, Deceased; and COREN SLADE-BELL, as next friend of C. K.,

J., a Minor, Nephew of MARCUS DEWAYNE SLADE, COREN SLADE-BELL, Individually

Sister of MARCUS DEWAYNE SLADE, Deceased, TANISHA SLADE, Individually

Sister of MARCUS DEWAYNE SLADE, Deceased and Heirs of MARCUS DEWAYNE, Deceased who files this Original Complaint. Plaintiffs complaining of Defendants, the CITY OF MARSHALL, TEXAS; FORMER POLICE CHIEF STANLEY SPENCE; JOHN JOHNSTON; CORTNEY WELLS , STACEY ROACH and TASER INTERNATIONAL, INC.

## A. PRELIMINARY STATEMENT

**1.** This is a civil action arising under 42 U.S.C.§ 1983 and the United States Constitution to redress the deprivation by the Defendants, acting under color of state law, of certain rights, privileges, and immunities secured to Marcus Dewayne Slade, by the United States Constitution.

**2.** Plaintiff's seek compensatory damages together with reasonable attorney's fees as authorized by 42 U.S.C. § 1988.

## B. PARTIES

**3.** At all times relevant to this action, decedent, **MARCUS DEWAYNE SLADE,** was a citizen of the United States of America and the State of Texas.

**4.** Plaintiff; **C.S. SLADE, Sr.**, an individual, is a citizen of the State of Texas.

**5.** Plaintiff; **DOROTHY SLADE**, an individual, is a citizen of the State of Texas

**6.** Plaintiff; **KIM SPEARMAN**, as next friend of **M. S., a Minor,** an individual, is a citizen of the State of Texas**.**

**7.** Plaintiff; **COREN SLADE-BELL**, as next friend of **C. K. , J. a Minor ,** an individual, is a citizen of the State of Texas.

**8.** Plaintiff; **COREN SLADE-BELL**, an individual, is a citizen of the State of Texas.

**9.** Plaintiff; **TANISHA SLADE**, an individual, is a citizen of the State of Texas.

**10.** Plaintiff, HEIRS OF MARCUS DEWAYNE SLADE, are individuals, citizen of the State of Texas.

**11.** Defendant, **CITY OF MARSHALL, TEXAS,** (hereinafter referred to as "Marshall"), is a municipality formed under and operating pursuant to the laws of the State of Texas. ***Marshall may be served with process by serving Frank Johnson ; City Manager, at 401 S. Alamo Marshall, Texas 75671.*** It is Marshall's responsibility to promulgate and implement policies and procedures prohibiting the use of excessive force in violation of minimum constitutional and statutory requirements. Further, it is also Marshall's responsibility to hire, fire, discipline, train, and supervise the officers of the Marshall Police Department. Finally, it is Marshall's responsibility to refrain from hiring, retaining, or allowing officers to serve who have a known propensity for misconduct and abuse of citizens, including the use of force that is grossly disproportionate to the need for same.

**12.** Defendant, **FORMER CHIEF STANLEY  SPENCE,**(hereinafter referred to as "Spence"), an individual, ***may be served with process at 2016 Elysian Fields Ave., Marshall, Harrison County, Texas 75672 or wherever he may be found.*** At all times material to this suit Spence was the Chief of Police of the Marshall Police Department. It was Spence's responsibility to promulgate and implement policies and procedures prohibiting the use of excessive force in violation of minimum constitutional and statutory requirements. Further, it was also Spence's responsibility to hire, fire, discipline, train, and supervise Marshall police officers because he was the police chief of the Marshall Police Department. Finally, it was Spence's responsibility to refrain from hiring, retaining, or allowing officers to serve who have a known propensity for misconduct and abuse of citizens, including the use of force that is grossly disproportionate to the

need for same.

**13.** Defendant, **JOHN JOHNSTON,** (hereinafter referred to as "Johnston"), an individual, *may be served with summons at his place of employment, Marshall Police Department 2101 E. End Blvd. North, Marshall, Texas 75670, or where he may be found.* At all times material to this suit Johnston was an officer employed by the Marshall Police Department. Each of the acts complained of arises from Johnston's conduct while acting under the color of state law, and was committed within the scope of his employment and authority with the Marshall Police Department.

**14.** Defendant, **CORTNEY WELLS** , (hereinafter referred to as "Wells"), an individual, *may be served with summons at her place of employment, Marshall Police Department, 2101 E. End Blvd. North, Marshall, Texas 75670,Highway 59 North, or where she may be found.* At all times material to this suit Wells was an officer employed by the Marshall Police Department. Each of the acts complained of arises from Wells's conduct while acting under the color of state law, and was committed within the scope of her employment and authority with the Marshall Police Department.

**15.** Defendant, **STACEY ROACH,** (hereinafter referred to as "Roach"), an individual, *may be served with summons at his place of employment, Marshall Police Department 2101 E. End Blvd. North, Marshall, Texas 75670, or where he may be found.* At all times material to this suit Roach was an officer employed by the Marshall Police Department. Each of the acts complained of arises from Roach's conduct while acting under the color of state law, and was committed within the scope of his employment and authority with the Marshall Police Department.

**16.** Defendant , **TASER INTERNATIONAL, INC.** (hereinafter referred to as "TASER"), a corporation formed under and operating pursuant to Delaware law, maintains its principal place of business in the State of Arizona. It *may be served with summons by serving its registered agent, The Corporation Trust Company at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.*

## C.  JURISDICTION AND VENUE

**17.**  The Court has jurisdiction over Plaintiffs constitutional claims for which redress is provided by 42 U.S.C. § 1983 and  is conferred on this Court by 28 U.S.C. § 1343(a)(3). Federal question jurisdiction is also conferred on this Court by 28 U.S.C. § 1331 because this action arises under the United States Constitution.

**18.** The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims and/or parties.

**19.** Plaintiffs also bring non-section 1983 claims against, Marshall, Spence, Johnston, Wells and Roach pursuant to the Texas Tort Claim Act. TEX. CIV. PRAC. & REM. CODE § 101.001, *et seq.* The Court has subject matter jurisdiction over these claims because the Tort Claims Act provides a limited waiver of sovereign immunity as to the facts of this case, as set forth more fully herein.

**20.** No exception to the waiver of immunity applies to reinstate Marshall, Spence, Johnston, Wells and Roach  governmental immunity for Plaintiffs' non-section 1983 claims.

**21.** Plaintiffs' Attorney has provided written notice as required by Texas Tort Claim Act. TEX. CIV. PRAC. & REM. CODE § 101.101(a)and (b);  additionally the acts and actions of the Defendants relating to the death of Marcus Dewayne Slade places the governmental unit(s) on

actual notice pursuant to Texas Tort Claim Act. TEX. CIV. PRAC. & REM. CODE § 101.101

( c).

**22.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because all or a substantial

portion of the events and the omissions  from which this lawsuit arises occurred within the

geographical boundaries of the Federal Eastern District of Texas.

## D. AGENCY / RESPONDEAT SUPERIOR

**23.** Whenever it is alleged in this Complaint that any Defendant did any act or thing, it is meant

that the Defendant's agents, servants, employees, parent agents, ostensible agents, agents by

estoppel, employees, and/or representatives did such act or thing, and at the time any such act or

thing was done it was done with the Defendant's authorization or was done in the normal or

routine course of agency or employment with Defendant.

## E. FACTS

### E(1) 911 CALL

**24.** On January 4, 2013 , a 911 Call was received by dispatch, the caller requested the Marshall,

Police Department to respond to a Duplex Apartment on Scoggins Street in Marshall in reference

to an individual who was causing a disturbance by hollering (crypt this, crypt this, crypt this...)

(*Source 911 audio recording*)

### E.(2) ARRIVAL AT SCOGGINS STREET

**25.** Defendant Johnston was the first Officer to arrived at the Scoggins Street location traveling a

route going eastbound on E. Houston in Marshall, Texas.(*Source video tape Marshall Police Unit*

*driven by Johnston*)

**26.** The Unit driven by Defendant Johnston turned right off E. Houston on to Scoggins at which

point visible in the street was a parked  truck pointed northbound in a head on position to

Defendant Johnston Unit, with an individual seated on the driver side being pulled by an

individual standing and leaning into the Truck from the passenger side with the passenger door of

the Truck being open.(*Source video tape Marshall Police Unit driven by Johnston*)

**27.**  Defendant Johnston parked his Unit with his overhead scroll light activated; Defendant

Johnston  appeared on the Video in front of his parked Unit after existing the Unit;  he approached

the parked Truck on the passenger side walking up to the door within a 4 feet or less of Decedent

Marcus Dewayne Slade.(*Source video tape Marshall Police Unit driven by Johnston*)

**28.**  Decedent  was in an agitated state  as to the individual in the truck but did not make any acts

or motions of aggression toward Defendant Johnston. (*Source video tape Marshall Police Unit

driven by Johnston*)

**29.** Defendant Johnston engaged Decedent Marcus Dewayne Slade  verbally however there was

no Audio. .(*Source video tape Marshall Police Unit driven by Johnston*)

**30.** Decedent Marcus Dewayne Slade steps away from behind the passenger door of the truck  at

which point it was  revealed that he was totally nude and at a distant of 4 feet or less from

Defendant Johnston. (*Source video tape Marshall Police Unit driven by Johnston*)

**31.** Decedent Marcus Dewayne Slade at this point  still was  showing a level of agitation toward

the individual seated on the diver's side of the truck began retrieving away from Defendant

Johnston in a eastwardly direction as Defendant Johnson retrieved in a southwardly direction still

without  Audio nor Decedent Marcus Dewayne Slade making any acts or motions of aggression

toward Defendant Johnston. (*Source video tape Marshall Police Unit driven by Johnston*)

**32.** As Defendant Johnston retreated  in a southwardly direction he started to remove his TASER from his holster.(*Source video tape Marshall Police Unit driven by Johnston*)

**E(3) TASER (*T*homas  *A. S*wift *E*lectric *R*ifle*)***

**33.**   Defendant Wells comes in view on Defendant Johnston video at a point subsequent to Defendant Johnston contact with Decedent Marcus Dewayne and the retreat referenced in Line 31 above.(*Source video tape Marshall Police Unit driven by Johnston*)

**34.** Defendant Wells as she enters into view appears to be in the process of preparing to remove her TASER from her holster.(*Source video tape Marshall Police Unit driven by Johnston*)

**35.**   Both Defendants Johnston and Wells were armed with  TASER X26 Model. ( *Source MPD Photos)*

**36.** Defendant Johnston was assigned  Weapon Serial No. X00-46258  used at the  Scoggins location on the night of January 4, 2013. ( *Source Marshall Police TASER Weapon Summary*)

**37.** Defendant Wells was assigned  Weapon Serial No.X00-43697 used at th Scoggins location on the night of January 4, 2013 . ( *Source Marshall Police TASER Weapon Summary*)

**38.** The TASER X26 is the  Fourth Generation of TASER Technology manufactured by TASER International and placed into the U.S. commerce market in about 2003. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**39.**   The "TASER X26 EMD Shape Pulse" the full name for the TASER X26 is represented by TASER International as being like previous TASER weapons it fires two probes up to a distance of 21 feet; the X26 transmits pulsed energy through the wires into the central nervous system of the target causing immediate involuntary incapacitation. *(Source TASER X26 Operating Manual, -Law Enforcement Only- Version X www.TASED.com)*

**40.**  EMD stands for "Electro-Muscular Disruption"  a process in which the electrical output of the TASER X26 when the probes are  fired into a human body effects the signaling mechanisms used by the body to communicate; the electrical output jams the communication system of the body. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**41.** The TASER X26 sends a series of energy pules quite similar to those used by the brain to communicate with the body, like radio jamming, the TASER-Waves overpower the normal electrical signal within the body's nerve fiber causing the human target instant loss of muscular control and body coordination usually resulting in the human target falling to the ground. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**42.** The TASER X26 Peak Shaped Pulse Discharge is  50,000 Voltage, the Digital Pulse Controller automatically delivers a 5 second burst for each pull of the trigger. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**43.** The TASER X26 Digital Pulse Controller during the first 2 seconds of the each runs at 19 pulses per second for maximum take down power and slows slightly to 15 pulses per second for the remaining 3 seconds of each burst. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**44.**  If the user of the TASER X26 continues to hold down the trigger through the full 5 seconds, the pulse rate will stay at 15 pulses per second until the user releases the trigger. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**45.** The TASER X26 can be fired from a distant in the  Dart Mode; the   two probes can penetrate approximately 2 cumulative inches of clothing, the probes do not have to penetrate the flesh or

cause bodily harm to be effective.*(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**46.** TASER International the manufacturer represents  that the TASER technology is so highly effective because the electrical signal penetrates the nervous system regardless of the placement of the probes and the entire human body is covered by a neural net which the TASER X26 uses to knock out the target. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**47.**   The TASER X26 can also be deployed as a "Drive Stun" with a used Air Cartridge after the Probes have been fired or without the Air Cartridge. The "Drive Stun"  works more effectively when the front of the TASER X26 is aggressively firmly pushed against the body of the assailant for the entire 5-second burst for maximum effects. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**48.**   In the "Dart Mode" the electrical current causes involuntary muscle contraction on the body mass between the two probes, in the "Drive Stun Mode"the painful current runs through the specific body area but does not cause neuromuscular incapacitation; both modes are painful.

*( Source 59 UCLA L. Rev. 1350,1353-54(2012)  Shocking the Conscience: What Police TASERs and Weapon Technology Reveal About Excessive Force Law, Aaron Sussman )*

**49.** The TASER X26 has a data collection feature which captures data on the Time, Date, Temperature  and Charge Duration for each firing of the TASER  X26 in the Dart or Drive Stun Modes, the stored data is downloadable.*(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X www.TASED.com)*

**50.** TASER International the manufacturer of the TASER Brand has publicly marketed the TASER since it inception as having  minimal and or no impact on the death of individuals who are  subjected to their TASER Weapons. *(Source www.TASER.com/research-and-safety/science-and-medical, TASER International news release distributed by GlobeNewswire, www.gloenewswire.com  June25, 2009 )*

**51.** Although Defendant TASER International has maintain the position as referenced in Item (50);  TASER marketing  over the years has evolved from  the  TASER being marketed  as  "Non-Lethal" to "Less-Lethal" coupled  with TASERs' distributions of  material as to the impact of TASER Weapons on  the General Public who may encounter a TASER Weapons in a Dart of Drive Stun Mode ; such as those listed below:

   A) TASER International Training Bulletin 12.0-04, June 28, 2005 Warned that "repeated, prolonged , and/or continuous  TASER device exposure(s) may contribute to a suspect's death. It warned that the TASER "may cause strong muscle contractions that may impair breathing and respiration. Officers were advised to "minimize the uninterrupted duration and  total number" of TASER discharges.

   B) TASER International Product Warnings-Law Enforcement *(LG-INST-LEWARNING-001 Rev. J June 2006)* **Deployment Health Risks: "Sudden In-Custody Death Syndrome Awareness"** If a subject is exhibiting signs of behaviors that are associated with Sudden In-Custody Syndrome, consider combining use of TASER device with immediate physical restraint techniques and medical assistance..[ *Signs of Sudden In-Custody Death Syndrome include: extreme agitation, bizarre behavior, inappropriate nudity, imperviousness to pain, paranoia, exhaustive exertion, "superhuman" strength, hallucinations, sweating*

*profusely.]*

C) TASER Training Academy Version 18 " TASER X26 Electronic Control Device (ECD)

Certification Test" Test Question No. 36 presented  the following question:

**36.** Which of the following is a warning sign that a subject might be at risk for an arrest

related death:

a) Bizarre or violent behavior

b) Disrobing

c) Unusual strength and/or endurance

d) All of the above

Answer Key: **Question 36**. **D (All of the above)**

 **52.**  Beyond Warnings  TASER has conducted and or commissioned over 100* studies and made

several technological advances relating to  TASER devices such as:

A. Studies  on human in which the continuous ECD application did not exceed 15 second and

none exceed has exceeded 45 seconds.

B. The data collection ability of the TASER after firing referenced in Item 49 herein

C. The TASER Camera which captures Video and Audio when a subject is being tased

D. The TASER "AXON flex, AXON body and Evidence Transfer Manager"

(*Source Conducted Electrical Weapon Research Index**)

**53.** Defendant TASER conducted and or commissioned studies as referenced in Item 52  have not

yet yielded a Designed Change that alters the prolonged and multiple discharges beyond the limits

reference in  their commissioned studies and those Warned of within TASER Publications which

warned of Death possibilities associated with certain groups based on  prolonged and multiple

discharges of TASER Devices. Additionally the commissioned studies in numerous cases

reflected Rebuttals by Defendant TASER to various safety issues raised by individuals in the

general public and science community. Defendant TASER  Rebuttals in some case also

contradicted Safety Warnings presented by Defendant TASER to end users of TASER devices

(*Source Multiple Warnings Notices issued by TASER*)

 54.  Defendant Johnston's TASER  contained a Video Camera with Audio *(referenced in Item*

*52.C)*; which by designed  was activated at the point in time that Johnston released the Safety on

his TASER.(*Source Johnston's TASER Video Camera and htt://store.trser.com*)

55.  Defendant Johnston's first Video view from his TASER Camera shows the ground and a

Lighted Dot on the ground from the Laser Sight on the TASER,  at this point there is still no audio

from Johnston's Patrol Car nor from the TASER Camera Unit. (*Source Johnston's TASER Video*

*Camera)*

56. Defendant Johnston moved the TASER from a ground level view to a point where the Laser

Dot is visible on the Left Side of  Decedent Marcus Slade body as Slade moves from the neutral

position he had take as originally referenced in Item 31; Johnston action was approximately  at the

3 second mark on his TASER Video. (*Source Johnston's TASER Video Camera)*

57.  Decedent Marcus Slade at this point is still totally nude except for the presence of a Do-rag

on his head.  (*Source Johnston's TASER Video Camera)*

58. Decedent Marcus Slade started moving on an angle in a Northwest direction at a point in time

that Defendant Wells appears in the video moving  in a Southeast direction towards the Decedent

Marcus Slade. (*Source Johnston's TASER Video Camera)*

59. Decedent Marcus Slade voice is captured on the Audio of the TASER Video Camera as he

moved in the direction of Defendant Wells.  (*Source Johnston's TASER Video Camera*)

**60.** Decedent Marcus Slade as he moved in the direction of Defendant Wells had his left and right

hands  positioned on his left and right hips and  at no point moved his hands  into a fighting or

reaching  motion toward defendant Wells.  (*Source Johnston's TASER Video Camera*)

**61** Defendant Johnston fired  his TASER  into the back of Decedent Marcus Slade at

approximately the 10 second mark on the TASER Camera Video.  (*Source Johnston's TASER

Video Camera*)

**62.** Decedent Marcus Slade at the point of the first TASER firing  by Defendant Johnston was

approximately 5 to 8 feet away from Defendant Wells still with his left and right hands

positioned on his left and right hips and  at no point moving his hands  into a fighting or reaching

motion toward defendant Wells.  (*Source Johnston's TASER Video Camera*)

**63.** Defendant Johnston first TASER firing was on 1/4/2013  at  8:42:46 PM for a duration of

00:00:05, the Temperature was 18C. (Source "TASER Weapon Summary" Weapon Serial X00-

446258 assigned to Defendant Johnston)

**64.** Decedent Marcus Slade approximately 2 -3 seconds after the first TASER firing fell to the

ground flat on his back .(*Source Johnston's TASER Video Camera*)

**65.** Defendant Johnston first audio is heard during the first TASER firing when he yells out "Cuff

Him".( *Source Johnston's TASER Video Camera*)

**66.** Marshall Police Officer Cory Adkinson, who was walking Southward toward the area

Decedent Marcus Slade first retreated to following contact with Defendant Johnston after drawing

his TASER , was the first Marshall Police Officer to respond to Defendant Johnston command to

"Cuff  Him". (*Source Johnston's TASER Video Camera*)

**67.** Officer Adkinson made initial contact with the Decedent Marcus Slade while he was still on the ground as a result of the first TASER firing; Decedent Marcus Slade  arms were at his sides and he was shouting .*(Source Johnston's TASER Video Camera)*

**68.** Defendant Johnston **Second TASER Firing** which was commenced approximately **[2 second]** after the completion of the *First TASER Cycle,*  at  8:42:53 PM for a duration of 00:00:05, the Temperature was 18C. (Source "TASER Weapon Summary" Weapon Serial X00-446258 assigned to Defendant Johnston)

**69.** Decedent Marcus Slade during the **Second TASER Firing** was still on his back and partial rolled on to his side but was push back on to his back by  Officer Adkinson who at that time was the only officer complying with Defendant Johnston command "Cuff Him";  Defendant Wells did not initially comply with the command  but instead engaged in an approximately 40 second diversion concerning a car leaving the Scoggins Street. (*Source Johnston's TASER Video Camera and video tape Marshall Police Unit driven by Johnston )*

**70.** Defendant Johnston during the course of the *Second TASER Cycle*, warned the Decedent that "I am going to hit you again" which he did with the **Third TASER Firing** which was commenced approximately **[6 seconds]** after the completion of the *Second TASER Cycle*  at  8:43:05 PM for a duration of 00:00:05, the Temperature was 18C. (*Source "TASER Weapon Summary" Weapon Serial X00-446258 assigned to Defendant Johnston*)

**71.**. Defendant Johnston followed the Third TASER Firing with additional   **TASER Firings**:

a) **TASER Firing Four; [7seconds]** after  *Third TASER Cycle*, **TASER Firing Four**  at  8:43:18 PM for a duration of 00:00:05, the Temperature was 19C.

b) **TASER Firing Five; [9 seconds]** after *Fourth TASER Cycle*, **TASER Firing Five**  at  8:43:33

PM for a duration of 00:00:05, the Temperature was 20C.

c) **TASER Firing Six ; [2 seconds]** after *Fifth TASER Cycle*, **TASER Firing Six** at 8:43:40 PM for a duration of 00:00:05, the Temperature was 19C.

d) **TASER Firing Seven**; **[1 second]** after *Sixth TASER Cycle*, **TASER Firing Seven** at 8:43:46 PM for a duration of 00:00:05, the Temperature was 20C.

(*Source "TASER Weapon Summary" Weapon Serial X00-446258 assigned to Defendant Johnston*)

**72.** Defendant Wells did not enter the handcuffing process until a period of time near the Fourth TASER Firing by Defendant Johnston (*Source Johnston's TASER Video Camera Audio and video tape Marshall Police Unit driven by Johnston* )

**73.** Defendant Johnston did not enter the TASER Cycle and handcuffing process until he completed Seven (7) TASER Firings, totaling 35 seconds of voltage in to the body of Decedent Marcus Slade from his Marshall Police Department issued TASER X26 Model, with a discharges of 50,000 volts delivered in 5 second burst for each pull of the trigger. *(Source TASER X26 Operating Manual,-Law Enforcement Only- Version X [www.TASED.com,,](www.TASED.com) "TASER Weapon Summary" Weapon Serial X00-446258 assigned to Defendant Johnston*)

**74.** Decedent Marcus Slade at no time obtained a position of command and or domination over Defendants Johnston, Wells or Officer Adkinson during the TASER Firings at some points his arms were at his sides while on the ground. (*Source Johnston's TASER Video Camera*)

**75.** Defendant Roach arrived at the Scoggins location at a point when Officer Adkinson and Defendants Johnston and Wells were all on Decedent Marcus Slade in a command and domination position. *(Source video tape Marshall Police Unit driven by Roach)*

**76.** Defendant Roach departed his unit and assisted in the handcuffing of the Decedent Marcus Slade. *(Source video tape Marshall Police Unit driven by Roach)*

**77.** Decedent Marcus Slade demeanor and language during the duration of his original contact with Defendants  Johnston, Wells, Adkinson and Roach  relating to that all matters  captured on Video and Audio were consistent with the TASER , In Custody Death Risk Warning previously *referenced  under Items 51.A-C herein.  (Source video tape Marshall Police Unit driven by Wells , Johnston's TASER Video Camera and  video tape Marshall Police Unit driven by Roach)*

**78.** Defendant Johnston and Roach acknowledged either by question and or by comments that they were aware that the Decedent Marcus Slade was under the influence of some type of intoxicating substance. (*Source video tape Marshall Police Unit driven by Wells  and  video tape Marshall Police Unit driven by Roach)*

**79.** Defendant Roach at one point posed a question to bystanders if Decedent Marcus Slade had ever acted this way before to which he received an affirmative answer of yes.(*Source video tape Marshall Police Unit driven by Wells  and  video tape Marshall Police Unit driven by Roach)*

**80.** After the Decedent Marcus Slade was restrained steps were taken  to place him in Marshall Police Unit. (*Source video tape Marshall Police Unit driven by Wells  and  video tape Marshall Police Unit driven by Roach)*

**81.** Decedent Marcus Slade who was under the influence of some type of intoxicating substance was non-compliant to several commands to stand up.(*Source video tape Marshall Police Unit driven by Wells  and  video tape Marshall Police Unit driven by Roach)*

**82.** Defendants Roach and Wells in and effort to obtain compliance with their commands to stand up "Drive Stun" Decedent Marcus Slade three (3) times while they were aware that Decedent

Marcus Dewayne Slade was under the influence of some type of intoxicating substance.

(*Source video tape Marshall Police Unit driven by Wells* , *video tape Marshall Police Unit driven by Roach, TASER Weapon Summary" Weapon Serial No. X00-446258 assigned to Defendant Johnston and TASER Weapon Summary" Weapon Serial No. .X00-43697 assigned to Defendant Wells)*

**83.** Defendant Roach borrowed the TASER of Defendant Johnston to "Drive Stun" Decedent Marcus Slade twice. (*Source video tape Marshall Police Unit driven by Wells* , *video tape Marshall Police Unit driven by Roach, TASER Weapon Summary" Weapon Serial X00-446258 assigned to Defendant Johnston )*

**84.** Decedent Marcus Dewayne Slade was eventually placed in the Marshall Police Unit assigned to Office Adkinson for transport purpose. (*Source video tape Marshall Police Unit driven by Wells and video tape Marshall Police Unit driven by Roach)*

**85.** Defendant Roach made and inquiry to Defendant Johnston concerning the Transport destination for Decedent Marcus Dewayne Slade  to wit the Hospital or County Jail.(*Source video tape Marshall Police Unit driven by Roach )*

**86.** Defendant Johnston  reply to the destination inquiry of Defendant Roach was transport to the County Jail. (*Source video tape Marshall Police Unit driven by Roach )*

**87.** Defendant Johnston response was  made at a point subsequent to his personal knowledge that Decedent Marcus Dewayne Slade was under the influence of an intoxication substance and knowledge obtained from bystander that the Decedent Marcus Dewayne Slade had Medical issues; that there was medication that could assist; that he has been this way before and that he should be taken to a Hospital.  (*Source video tape Marshall Police Unit driven by Wells and*

*video tape Marshall Police Unit driven by Roach)*

**88**. Prior to the departure of Adkinson Unit from the Scoggins Street location bystanders informed all Defendants that the Decedent had Medical issues; that there was medication that could assist; that he had been this way before and that he should be taken to a Hospital.  (*Source video tape Marshall Police Unit driven by Wells* and  *video tape Marshall Police Unit driven by Roach)*

**89.** One bystander that voiced a concern as to whether the Decedent Marcus Dewayne Slade was dead; received a response from Defendant Wells that he is not going to die.  (*Source video tape Marshall Police Unit driven by Wells* )

**90.** Decedent Marcus Dewayne Slade was transported in the Marshall Police Unit of Officer Adkinson which has a video system which did not work.  (*Source video tape Marshall Police Unit driven by Roach)*

**91.**. The Marshall Police Unit of Officer Adkinson departed the Scoggins location followed by the Marshall Police Unit driven by Defendant Roach..  (*Source video tape Marshall Police Unit driven by Roach)*

**92.** At a point upon arrival at the Harrison County Jail Decedent Marcus Dewayne Slade was found to be non-responsive and was eventually pronounce dead. (*Source video tape Marshall Police Unit driven by Roach and other Sources)*

### F. CAUSE OF ACTION NO: 1- VIOLATION OF 42 U.S.C. § 1983 BY MARSHALL, SPENCE, JOHNSTON, ROACH and WELLS

**93.** Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-92 as if fully set forth herein.

**94.** Defendants,  Marshall and Spence, had a duty to properly train , set policies , procedures and

practices  for the use of TASERs , the Arresting of Citizens, Assessment of Physical Harm to

Citizens and Reasonable use of Force. Although Marshall and Spence had such a duties, they

failed to perform said duties for  the Defendant officers who participated in the use Excessive

Force and or Death  of Marcus Dewayne Slade.

 **95.** The use of excessive and objectively unreasonable force by Marshall police officers,

Johnston, Wells and Roach as set out herein above complied with the deficient actual policies,

procedures, practices, training and customs of the Marshall and Spence, which tolerated such use.

**96.** Defendant  Johnston 7 (seven)  TASER firings were objectively unreasonable in light of the

surrounding setting and circumstance previously plead and incorporated herein including

Defendant Johnston total disregard for the Life of Decedent Marcus Dewayne Slade by his

constant TASER firing, failure to seek the assistance of paramedics or transport Decedent Marcus

Dewayne Slade to a Hospital setting to address the physical harm to Decedent Marcus Dewayne

Slade associated with Defendant Johnston use of excessive and objectively unreasonable force.

**97.** Defendant Roach 2 (two)  TASER firings were objectively unreasonable in light of the

surrounding setting and circumstance previously plead and incorporated herein including

Defendant Roach total disregard for the Life of Decedent Marcus Dewayne Slade by failure to

seek the assistance of paramedics or to transport Decedent Marcus Dewayne Slade to a Hospital

setting to address the physical harm to Decedent Marcus Dewayne Slade associated with

Defendant Roach use of excessive and objectively unreasonable force.

**98.** Defendant Wells 1 (one)  TASER firing was objectively unreasonable in light of the

surrounding setting and circumstance previously plead and incorporated herein including

Defendant Wells  total disregard for the Life of Decedent Marcus Dewayne Slade by failure to

seek the assistance of paramedics or  transport Decedent Marcus Dewayne Slade to a Hospital setting to address the physical harm to Decedent Marcus Dewayne Slade associated with Defendant Wells  use of excessive and objectively unreasonable force.

**99.** Defendants Marshall, Spence,  Johnston, Roach and Wells , acts and actions of commission and omissions  in the surrounding setting and circumstances previously plead and incorporated herein reflects  a deliberate indifference to and conscious disregard of Decedent Marcus Dewayne Slade constitutional rights under the Fourth Amendment as a United States citizens, proximately caused by Defendant  Marshall, Spence, Johnston, Roach , and Wells , deficient  policies, training, procedures, practices, and customs associated with TASER use.

**100.** Marshall and Spence breached their duty to provide their officers with adequate policies, training, procedures, and practices associated with TASER  use. The grossly inadequate policies, training, procedures, practices, and customs associated with TASER  use is a producing and proximate cause of the unwarranted use of Excessive Force, and or Death of Marcus Dewayne Slade for which the Plaintiffs complain.

## G. CAUSE OF ACTION NO:  2 – BATTERY – INFLICTION OF BODILY INJURY

**101.**  Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-100 as if fully set forth herein.

**102.**. Defendants, Marshall and Spence employed  Johnston, Roach and Well at all times relevant to this lawsuit.

**103.** Defendants Johnston, Roach and Wells, officers of Marshall, made physical contact with Marcus Dewayne Slade a person, as described herein.  Moreover, Marshall and Spence's officers,

Johnston, Roach and Well  caused an object to make contact with Marcus Dewayne Slade person, specifically, a TASER device as described herein.

104.  The officers proximately caused  injuries and death when they deployed TASER devices items of tangible personal property, on Marcus Dewayne Slade person.

105. The actions of Marshall, Spence, Johnston, Roach and Well  can only be described as intentional. Marshall and/or Spence  recklessly failed to select, train, and supervise their officers to prevent the assault on, injuries to, and death of Marcus Dewayne Slade.  Johnston, Roach and Well  employees of Marshall and/or Spence  would be personally liable to Marcus Dewayne Slade  under Texas law.

106.  The actions of Defendants proximately caused injuries to Marcus Dewayne Slade which resulted in his untimely death. Marcus Dewayne Slade  injuries and death resulted in damages as described herein.

## H.  CAUSE OF ACTION NO: 3- WRONGFUL DEATH DAMAGES FOR C.S. SLADE, SR. and DOROTHY SLADE

107. Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-106 as if fully set forth therein.

108.  This claim for damages resulting from the wrongful death of Marcus Dewayne Slade, Decedent, is brought by Plaintiffs pursuant to Texas Civil Practice and Remedies Code Section 71.001, *et seq*. This claim is based upon the facts and legal theories more fully set out herein.

A. Plaintiff  C.S. Slade is Decedent's surviving father

B. Plaintiff Dorothy Slade  is Decedent's surviving mother.

109. Each Defendant is a person against whom Plaintiff may recover within the meaning of Texas Civil Practice & Remedies Code sections 71.002 and 71.001(2).

**110.** When he died, Marcus Dewayne Slade was in good health with a normal life expectancy. Plaintiff would show that Marcus Dewayne Slade was 32 years old at the time of his tragic death and but for Defendants' action would have lived to an age of at least 70.5, according to the 2008 United States Life Tables

**111.** Marcus Dewayne Slade was a loving and dutiful  Son and provided love, care, affection, nurture, advice, counsel, guidance, and pecuniary support all of which he would have continued to provide in the future.

**112.** As a result of the wrongful death of Marcus Dewayne Slade, Plaintiffs suffered damages separated and apart from those Marcus Dewayne Slade suffered before he died.  Defendants' acts and/or omissions proximately caused Plaintiffs damages which include, but are not limited to:

      A.      Mental anguish and grief in the past and future;

      B.      Pecuniary loss in the past and future; and

      C.      Termination of the parent-child relationship in the past and future.

## I.  CAUSE OF ACTION NO: 4-  WRONGFUL DEATH DAMAGES FOR , KIM SPEARMAN next friend of M. S.

**113.** Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-112 as if fully set forth herein.

**114.** This claim for damages resulting from the wrongful death of Marcus Dewayne Slade, is brought by Kim Spearman, as next friend M..S.  a minor child  pursuant to Texas Civil Practice

and Remedies Code Section 71.001, et seq.  This claim is based upon the facts and legal theories more fully set out herein.

**115.** M. S. is the surviving child of Marcus Dewayne Slade, Deceased.

**116.** Each Defendant is a person against whom Plaintiff may recover within the meaning of Texas Civil Practice & Remedies Code sections 71.002 and 71.001(2).

**117.** When he died, Marcus Dewayne Slade was in good health with a normal life expectancy. Plaintiff should show that Marcus Dewayne Slade  was 32 years old at the time of his tragic death and but for Defendants' action would have lived to an age of at least 70.5, according to the 2008 United States List Tables.

**118.** The Defendant was a loving and dutiful father and provided love, care, affection, nurture, advice, counsel, guidance, and pecuniary support, all of which he would have continued to provide in the future.

**119.** As a result of the wrongful death of Marcus Dewayne Slade, Plaintiff Kim Spearman, as next friend of M.S. a minor child suffered damages separate and apart from those Marcus Dewayne Slade, suffered before he died.  Defendants' acts and/or omissions proximately caused Plaintiff damages which include, but are not limited to:

A.   Mental anguish and grief in the past and future;

B.   Loss of consortium in the past and future;

C.   Pecuniary loss in the past and future; and

D.   Termination of the parent-child relationship in the past and future.

## J. CAUSE OF ACTION NO: 5 - SURVIVAL DAMAGES

**120.** Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-119 as if fully set forth herein.

**121.** In addition to other counts which make Defendants liable to Plaintiffs under the Texas Wrongful Death Act, Defendants are also liable to the Heirs of Marcus Dewayne Slade pursuant Texas Civil Practice & Remedies Code sections 71.021 (a)-( c)

**122.** Marcus Dewayne Slade was a person who was born alive

**123.** Before dying, the causes of action stated herein accrued to Marcus Dewayne Slade benefit.  He could have asserted the causes of action stated herein against Defendants had he lived

**124.** As a direct and proximate result of Defendants' acts and/or omissions as stated herein, Marcus Dewayne Slade suffered fatal injuries which resulted in damages that his Heirs are entitled to collect on his behalf.  Therefore, the Heirs are entitled to collect compensation for damages suffered  as follows:

    A.   As a direct and proximate result of Defendants' acts and/or omissions, Marcus Dewayne Slade suffered fatal injuries.  He suffered excruciating and debilitating pain and agony until succumbing to his injuries.  Therefore, his Heirs seeks recovery for  conscious physical pain and suffering occurring in the past; and damages for mental anguish occurring in the past.

    B.   Marcus Dewayne Slade  was buried in a manner reasonably suited to his station in life.  Therefore, his Heirs, are entitled to compensation for damages in an amount equal to his funeral and burial expenses.

## K.  CAUSE OF ACTION NO: 6 – STRICT PRODUCTS LIABILITY OF TASER

**125.** Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-124 as if fully set forth therein.

**126.** Plaintiffs invoke the doctrine of strict liability pursuant to Restatement (Second) of Torts § 402A and adopted by the Texas Supreme Court.

**127.** The TASER device(s) that is(are) the subject of this lawsuit was (were) designed, manufactured, assembled, marketed, distributed, and sold by Defendant TASER International, Inc. and was(were) defective and unreasonably dangerous to consumers, users, and bystanders.

**128.**   Defendant TASER is engaged in the business of designing, manufacturing, assembling, marketing, distributing, and selling TASER devices, including the TASER device(s) that is (are) the subject of this lawsuit, to consumers in the stream of commerce.

**129.** Defendant TASER intended and expected that the TASER device, so introduced and passed on in the course of trade would ultimately reach a consumer or user in the condition in which it was originally sold.

**130.** The TASER device(s) that is(are) the subject of this lawsuit in fact reached officers of the Marshall  Police Department in the same or substantially the same condition in which it was originally sold and when it left TASER's control.

**131.** When the TASER device(s) that is(are) the subject of this lawsuit left TASER's control, and at all times relevant to this lawsuit, a safer alternative design existed that would have eliminated the risk of injury and death such as that suffered by Marcus Dewayne Slade.

**132.** Defendant TASER sold its devices with warnings and offered video and live instruction on the use of its products.  Whenever the term "warnings" is used herein, it is meant to include, but is not limited to, written warning, written instructions, video training courses, and live training courses.

**133.** Defendant TASER failed to provide adequate warnings to its consumers and/or users alerting them to the risk of injury or death resulting from:

        A.      repeated or prolonged use;

        B.      use on persons who are expected to be under the influence of alcohol, prescription or illegal drugs;

        C.      use on persons who are distressed, shocked, and/or fatigued; or

        D.      use on persons with head wounds.

**134.** Moreover, Defendant TASER failed to accompany its products with adequate warning or instructions on how an officer should properly respond and provide medical assistance to an individual on whom a TASER device has been deployed once the device renders him/her unconscious or unresponsive or causes respiratory arrest

**135.** Defendant TASER is liable for the Plaintiffs' damages because it exercised substantial control over the content of the warnings that accompanied the TASER device(s) that is (are) the subject of this lawsuit.  Those warnings were inadequate to prevent Marcus Dewayne Slade  death.

**136.** When the TASER device(s) that are the subject of this lawsuit left the control of Defendant TASER, foreseeable users, such as the officers who utilized such devices on Marcus Dewayne Slade, were not and still are not likely to possess knowledge of the extent and magnitude of the risks

associated with using TASER devices as designed, nor could they possibly appreciate the severity of injuries that are likely to occur.

**137.** Without such knowledge, consumers and/or foreseeable users, such as the officers who utilized TASER devices on Marcus Dewayne Slade would not be in a position to avoid the product's inherent dangers through the exercise of ordinary and reasonable care.  Conversely, Defendant TASER knew and was certainly in the best position to know that TASER devices, as designed, posed a tremendous risk of injury and death to individuals on whom the devise were deployed.

**138.**  Defendant TASER's failure to include adequate warnings with its products was a producing cause of Marcus Dewayne Slade  injuries, death, and Plaintiff's damages.

## L.  CAUSE OF ACTION NO: 7– NEGLIGENCE OF TASER

**139.** Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-138 as if fully set forth therein.

**140.** Defendant TASER owed its consumers and /or foreseeable users, including those on whom such devices would be deployed, a reasonable duty of care in the design, production, marketing, distribution, and sale of TASER devices.

**141.** Defendant TASER ignored and/or breached that duty by its negligent acts and/or omissions which include, but are not limited to its:

      A.      Failure to design and produce a reasonable safe TASER device;

B.  Design, manufacture, assembly, marketing, distribution, and sale of defective TASER devices;

C.  Placing into the stream of commerce a TASER device that was defective in that it failed to be accompanied by adequate warnings;

D.  Placing into the stream of commerce a TASER device that was unfit for its intended use;

E.  Placing into the stream of commerce a TASER device likely to cause injury when used with ordinary care;

F.  Failure to provide adequate warnings with the product after learning, knowing, or having reason to know of the defects existing in the product that rendered it unreasonably dangerous for its intended use;

G.  Failure to provide adequate warning reasonably calculated to catch the attention of a consumer and/or user or that would convey a fair indication of the nature and extent of the dangers  involved in using  or misusing its product;

H.  Failure to adequately warn consumers and/or foreseeable users of the inherent dangers associated with the use of TASER devices;

I.  Failure to actively seek information regarding incidents in which individuals on whom such devices were deployed were injured and/or killed as the result of the devices' use;

J.  Failure to protect individuals on whom it foresaw and intended such devices would be deployed.

K.  Failure to give adequate notice to consumers and users of the concealed dangers, including, but not limited to the risk of serious injury or death arising from repeated or prolonged use of the device or from the use of the device on individuals who are distressed, shocked, fatigued or under the influence of

alcohol or prescription or illegal drugs;

L.   Failure to provide post-sale warnings after learning, knowing, or having reason to know of the defects existing in the product that rendered it unreasonably dangerous for its intended use;

M.   Failure to take subsequent remedial measures or recall the product after learning, knowing, or having reason to know of the defects existing in the product that rendered it unreasonably dangerous for its intended use;

N.   Ignoring or failing to investigate scientific, technological, and industry information regarding the risks of serious personal injury or death posed by its products;

O.   Ignoring or failing to investigate national publications relating to the risks of serious personal injury or death posed by its products;

P.   Ignoring or failing to investigate other lawsuits involving similar claims and incidents in which individuals were seriously injured or killed by TASER devices; and

Q.   Ignoring or failing to investigate other similar incidents in which individuals were seriously injured or killed by TASER devices.

**142.** As an actual and proximate result of Defendant TASER's negligent acts and/or omissions, the TASER device(s) that caused Marcus Dewayne Slade  injuries and death was (were) placed in the stream of commerce in a defective and unreasonably dangerous condition.

**143.**  As an actual and proximate result of Defendant TASER's negligent acts and/or omissions, Marcus Dewayne Slade  died, causing Plaintiffs' damages as stated herein.

**144.** Marcus Dewayne Slade injuries and death and the manner in which both occurred were

reasonably foreseeable to Defendant TASER.  TASER had actual and/or constructive knowledge from within the industry, national publications, prior lawsuits, and consumer complaints that consumers, users, and bystanders were routinely injured and/or killed by TASER devices marketed to police departments as entirely safe.

**L.  CAUSE OF ACTION NO: 8– BYSTANDER CLAIMS, COREN SLADE-BELL**

**as next friend of C.K.J .a minor, TANISHA SLADE, COREN SLADE-BELL**

**145.**  Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-144 as if fully set forth therein.

**146.**  This claim is based upon the facts and legal theories more fully set out herein.

      A. Plaintiff Coren Slade-Bell as next friend of C.K..J.  a minor and

         nephew of Decedent  Marcus Dewayne Slade.

      B. Plaintiff Tanisha Slade is the Sister of   Decedent Marcus Dewayne Slade.

      C. Plaintiff Coren Slade-Bell is the Sister of   Decedent Marcus Dewayne Slade.

**147.**  Plaintiffs were present at the Scoggins Street location  as Bystanders and witnessed the acts and actions of the Defendants associated with use of TASERs and the Death of Marcus Dewayne Slade.

**148.**  Plaintiffs  Bystanders/Relatives  of the Decedents Marcus Dewayne Slade suffer the following actionable Damages for the action and actions of the Defendant:

      A. Infliction on Emotional Distress

      B. Mental Anguish past and future

## O.  ATTORNEYS FEES

**149.** Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-148 as if fully set forth herein.

**150.** Plaintiffs request recovery from Marshall, Spence, Johnston, Wells and Roach of reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## N.  EXEMPLARY DAMAGES

**151.** When viewed objectively from Defendants standpoint at the time of the occurrence from which this lawsuit arises, their acts and/or omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

**152.** Moreover, Defendants had an actual, subjective awareness of those risks and nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others.

**153.** Defendants' acts and/or omissions constituted a flagrant disregard for the safety of Plaintiff.

**154.** Thus, Plaintiffs are entitled to exemplary damages for the injuries and death resulting from Defendants' actions.

## O.  CONDITIONS PRECEDENT

**155.** All conditions precedent have been performed or have occurred.

## P.  PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be duly cited to appear and answer.  Plaintiffs further pray that, upon final hearing, the Court award judgment on Plaintiffs' behalf against Defendants for:

1.   Compensatory damages;

2.   Reasonable attorney's fees and costs Plaintiff expended from the City of Marshall, Former

Chief Stanley Spence, Johns Johnston, Cortney Wells, and Stacey Roach pursuant to 42
U.S.C. § 1988;

3.   Exemplary damages;

4.   Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

5.    Such other and further relief to which Plaintiffs show themselves justly entitled.

Respectfully submitted,


By :/S/   **William Todd Hughey**

**Bar No. 102455000**

**The Hughey Law Firm P.L.L.C.**

**_Hugheylaw@sbcglobal.net_**

Ph. No. 903-935-5550

Fax No. 866-823-7185

P.O. Box 2012

Marshall, Texas 75671

**ATTORNEY FOR PLAINTIFFS**